Attorney for the appellant, would you introduce yourself please? Denise Murchison on behalf of Dr. Dorothy J. Lucas Ms. Richardson, and the attorney for the appellate? Andy Creighton, Assistant State's Attorney for Cook County. Very good. Fifteen minutes each. Yes. Appellant, reserve from your portion however much time you want to use for rebuttal. Ms. Richardson, you may proceed. Good morning, Your Honor. May it please the Court? My name is Denise Murchison and I represent the appellant in this case, Dorothy J. Lucas. There are two issues before the Court. This case was dismissed upon defendant's motion for summary judgment, and the motion for reconsideration was denied. The plaintiff will agree with the defendant, and that is there are two issues, and those two issues are a violation of the Whistleblower Act and count two, which is retaliatory discharge count. The first issue could be phrased whether defendant, the Cook County Department of Public Health, violated the Illinois Whistleblower Act because Dr. Lucas was dismissed in retaliation for refusing to participate in an activity that would result in a violation of the law. What was the exact violation? The exact violation, we're referring to the Medical Practices Act, which requires, because physicians, like attorneys, are regulated. We're regulated by the Supreme Court. They're regulated by the Department of Professional Regulation. That particular section, which is 1622 5A, requires that physicians are to be competent and they are not to engage in any unprofessional and unethical conduct. And it is unprofessional and unethical to take on responsibility for a patient to provide a service that is outside your training. Well, her training, she was a doctor licensed in medicine in all of its branches, correct? What would be a more correct statement, Your Honor, if I may, I'd like to expand upon that, is like every physician, she went, Dr. Lucas went through medical school, and after that there's a residency. The residency is to enable the physician to specialize, to perform the highest level of care to their patients. And also, in order to be board certified, and Dr. Lucas is board certified, in fact, every physician in the county is board certified, she had to undergo special training and special examination that pertains to being an obstetrician and a gynecologist. And that, by definition, means providing services to women. Women are the only people that deliver babies. Does that mean that she's never able to see a male patient? Or that she only sees them when she wants to see them? That means that as a physician, and under the regulation of this state, you don't engage in providing services to a patient that are beyond the scope of your training. That's not to say that she couldn't get the training. She refused the training. Well, let me expand upon that, if I may. Before we do that, before we go back to expanding about her refusal to go to training, let's go back to what you said first, which was that this is a retaliation suit. She was advised several times. One time she was advised on August 24th of 2008 that she had to complete the training in the next couple of months or she'd be terminated. Correct? That's correct, Your Honor. And then the first time she brought this problem to anybody's attention at the board would be on September 4th, some 10 or 11 days after being told we're going to fire you if you don't get this training. Is that right? Your Honor, that would not be correct. But to be honest, the record does not reflect otherwise. But this is not a negotiation, Your Honor. This is not a negotiation. No, it's an order. Yes, it's an order. You take this training or you will be fired. But actually, I think the record really needs to be clear on this. The first notice that Dr. Lucas received is you take this training or you will be disciplined up until termination. Well, that could be a suspension. We'll suspend you until you go get the training. But when she complained to Illinois Department of Human, I'm sorry, Illinois Department of Professional Regulation, then she gets another letter from the county that further proves this is not a negotiation. They say you take this training or you be fired. Is she covered under a union? If you bring up negotiation, are employers in Illinois required to negotiate with what they tell their employees to do? She's not a member of the union. But as a physician, and she's in a different category than the plumber or the teacher, as a physician, she is required and bound not to commit malpractice. Well, wasn't this the argument raised in Taylor, right? A very recent Illinois Supreme Court case. And then they say that insufficient allegations of public policy are just that, they're insufficient. And Taylor was a much stronger case, I suggest, than your claim. Well, let me distinguish this from Taylor. The allegations of a violation of public policy is totally different in this case. In fact, the public policy for physicians is really codified in the Medical Practices Act. In fact, the judge below, Judge Mitchell says, in the case law says, it's not really defined what public policy is. But public policy is something that really strikes at the heart of what is right and just. It goes to the collective rights of society, of the citizens of the state. And I would say collectively the citizens of the state are entitled to competent health care, whether it's a physician or a nurse. But what's before this court is a physician. That's the public policy. And public policy, per Taylor, a very recent case, is to be cited by the trial court, meaning it's appropriate for summary judgment. That's the holding in Taylor, one of the holdings in Taylor, is it not? You don't get to go to a jury and argue to a jury. Well, public policy means it's up to the judge to decide what public policy is. So it means it's fit for summary judgment. Well, why we're before this court or the appellate court is, it's a question of law. And we're saying the judge got it wrong. Well, how about now in the trial court? What is it? I'm sorry, it's a question of law. Public policy, is it a question of law or fact in the trial court? It's a question of law, Your Honor. Thank you. And we are saying, that's why we're here, the trial court got it wrong. There is a public policy under the Medical Practices Act. The subject we're talking about here is sexually transmitted diseases. Is that correct? Sexually transmitted, absolutely. Gonorrhea, syphilis, yes. Which is different in men than it is in women. Well, except for their genitalia, the kidneys and the ureters are the same, correct? That's no small thing, Your Honor. But you're absolutely correct. So what is it? Was there any other conscious or consciousness, conscious objection because of the nature of it, to refuse the ten days of instruction to be able to treat both men and women? Your Honor, I think that needs to be reframed. She did not refuse the training because it would involve men. She refused the training because it wasn't enough. Ten days is not adequate for a physician because she wants to practice at the highest level. She didn't ask for more and she never took any. Your Honor, once again, this was not a negotiation. They told her, Dr. Lucas, she had to take that training. So what was her alternative? To take the training and then commit malpractice? And then it would be clear to the county that the training was not adequate. Those were her options. I suppose she could have taken the training and then gotten more training so that she'd be personally satisfied. Right? She could do that. She could go for the ten days. See what it is because if you don't go, you have no idea what it is. And see if it's insufficient after going for ten days. And then sign up for more classes to learn about males and sexually transmitted disease. She could have done that, right? Your Honor, this case or any cases before you is not about could have. This case is about... It is in this case because she said she refused to do so. And you're saying that was good. She was correct in refusing to do so because she could never learn in ten days. Even though nobody knows what's contained in the ten days. Well, can I expand upon that? And we can liken it to the training for an attorney. You go through law school and she went through med school and she specializes in examining women. She went through four years of med school and four years of residency and the special training to become an OBGYN. Can you replicate the attention and the detail and the dedication that's needed to become a competent physician or an attorney in an area in ten days? The answer is no. And she knew that. Well, again, how life works where I go, where I've been around, when people graduate from law school they get picked up often by the public defender's office, the state's attorney's office, and the first day on the job they're standing in front of a judge arguing. Unfortunately, that doesn't happen anymore. Now they're stuck in various side jobs for five or six years before they see a trial court. But, yeah, back in the day you went right to a trial court. That was your job. Retrospect was tried by a guy named Bill Martin.  There's no substitute for experience. And if we're talking about lawyers you can't get experience if you don't take the course. And that's what the training has to be. And that's what Dr. Threat testified to. He was a friend of hers who had no competence, according to the record, in any of this. Well, let me cite what the record says to me and what hopefully it says to you. Dr. Threat was an obstetrician gynecologist just like Dr. Lucas. Dr. Threat went through the training, which is medical school, the residency, and he is board certified. He knows what is required in order to provide optimum care, optimum care to a patient. And that's what he testified to. And you're arguing it was a decision in 10 days that Dr. Lucas could have gotten that level of training. And, as has been said before, if she wanted more she could have taken more. Your Honor, it wasn't offered to her that she could take more. It says very clearly in the letter from the Cook County Department of Public Health, this is the training we're providing, you take it or be disciplined. And she refused to take it. She refused to violate the Medical Malpractice Act. What does the Medical Malpractice Act say in terms of taking training? That you can't take it? That's what she did. She chose not to take any training in this area. And so it's your argument in front of us that the Medical Malpractice Act allows doctors to decline taking training and they should keep their jobs for that. That's what happened. That would be kind of an absurd interpretation with the Medical Malpractice Act. The Medical Malpractice Act is affirmative. It's affirmative. And it says that physicians are to act in such a way not to be unprofessional, not to be unethical, they're to be competent. So the ball is in her court. The ball is in her court to be competent. That's what the Medical Malpractice Act says to every physician. And Dr. Lucas was acting with the due care that we would expect of any physician. So the logic of that is that she's incompetent and that's why she wouldn't do this? No, that's not the logic. No, the logic is in order to be competent, she needed more than 10 days. And I like to repeat that. In order to be competent, she needed more than 10 days. By the way, your expert witness is Dr. Trudell. He didn't speak to anyone about what this training would have. He had no knowledge as to what the training being offered to her consisted of. He did know this, Your Honor. So what value is his opinion, if any, if he had no idea what training was being offered to her? Your Honor, this much. Maybe that training was sufficient. This much, Dr. Threatt, did know. You want us to categorically decide as a matter of law that the training that was being offered was totally insufficient and she would remain incompetent to practice on males? And how can we do that? Your Honor, that's a question of fact for the jury, whether or not that training was sufficient or not. That is a question of fact for the jury. I think you may have had sufficient time for rebuttal. Okay, thank you. Okay? So please conclude. I'll say the balance of my time. I think I've hit my three points, and that is there was a violation of the Medical Malpractice Act, that there was a retaliation because she reported this violation to the Department of Public Regulations, and the decision below should be reversed. Thank you. Good morning. Good morning. I'd like to just start by addressing one of the issues that Justice Simon raised in regards to whether or not there is anything in the Medical Practice Act or in the Administrative Code that really reflects on a public policy regarding the treatment of male and female patients or the issue of refusing to attend training. And this is a retaliation case under the Whistleblower Act. If I could just cite the statute, the very brief part of it for a second. It said the retaliation against an employee for refusing to participate in an activity that would result in a violation of a state, federal, law, rule, or regulation. There's nothing in the Administrative Code that was cited here and nothing in the Medical Practice Act that's only vaguely referred to that addresses the issue of treating male and female patients. And as I believe Justice Simon pointed out, when a physician is licensed, they're licensed to practice medicine as a MD in all of the different aspects of that particular profession. And I'd like to, I think it was Justice Quinn that was referring, I believe it was to the Turner case, but the Turner case is the one I referred to where the Supreme Court addressed a very similar issue. It was Taylor, wasn't it? I thought it was, well, the one I'm referring to is Turner that I relied upon. But it's basically the same principle, and the court pointed out that an employer should not be imposed for liability where a public policy standard is too general or too vague and doesn't provide specific guidance so that it's subject to different interpretations. And that's exactly what we have in this particular case. I'd like to, I think the Court's obviously aware of the refusal of the plaintiff in this particular case to attend the training. I would just point out that she never asked what the training consisted of even, and Dr. Threat never even made an inquiry to the Department of Public Health as to what the training might consist of. And so we have this whole idea of this blank area here, and as was pointed out, we don't know what would have happened if Dr. Lucas had attended the 10 days of training and then advised the department that it was insufficient. But at least they would have had, their hands wouldn't be tied at that point, and they would have had the opportunity to provide further training for her. She was a long-term employee there, and they weren't trying to get rid of her on any basis. This was an economic and medically required combination of these two different departments. It was really going on back from April of 2007, and that's documented in the record. There's an email from Dr. Lucas as early as April of 2007, complaining about the fact that the issues come up now, that the male and the female STD clinics are going to be combined. So she, they tried to work with her through this whole period of time, over almost a year and a half, to get her to attend the training and to meet the requirements that the county had and the Department of Health had in that regards. In regards to Dr. Threatt, I think it's already been pointed out, he never even made an inquiry as to what the training would be. He never taught STD in any regards. He testified to that in his deposition, so I don't even think he's an expert in any regard. But both Dr. Lucas and Dr. Threatt testified that the issue of training is not against public policy, of course. I'd just like to finally just address the issue of this retaliation and the timeline for a second. First of all, we have a non-pretextual reason for the combination of the two different clinics, and that goes back to there were three different issues that were raised. One is it was economic, that they could have one practitioner treat both the male and female patients. Secondly, they could treat partners at the same time, which had a benefit in regards to STD. And for the third reason, they could also teach family planning or provide family planning at the same time to both of the partners. So there were both economic and practical medical reasons to combine the clinics that were going on. And then briefly, I just want to talk about the timeline. I'd already mentioned this was going on since April of 2007, and there's an email from Dr. Lucas addressing that issue and her concerns about it, which is in the supplemental record at C-24, 26, and 48. Then in May, there was a staff meeting. In August 29th, there was another staff meeting in 08. And then there was a letter of 24th of the 29th offering the training again, and that's the letter where she was advised she must complete it by October 31st. And September 22nd, and this is after she wrote the DPR, there was a letter from Dr. Murray, who was head of that department, explaining that the training required would be only focused in a couple of areas and shouldn't be very complicated and would be made available. And Dr. Murray's opinion was they would certainly be able to adequately meet Dr. Lucas's concerns. Then the final thing we have here to try to get Dr. Lucas to cooperate and meet the requirements the day before she was terminated, which was even after October 31st, Ms. Hines and Dr. Murray again met with her to try to determine if she would, in fact, now go to the training. And this was on November the 6th, and she again refused, and then she was terminated on the next day. So there's nothing in regards to pretext, and there's nothing in regards to timeline that indicates retaliation in this case. That completes my presentation, unless the Court has a question for me. I'd like to take page 7. You point out that Illinois has long adhered to the judicially created doctrine of non-review of hospital staffing decisions, sending Goldberg. Goldberg actually applies to private hospitals, is that correct? It does, yeah. There hasn't been a case yet about whether it extends to public. I agree with you on that. Okay. Thank you. Thank you. Any rebuttal? I just have a few points that I would like to address. The case that was being cited by Justice Quinn was actually Turner, not Taylor. Okay. I misspoke. Pardon me? I misspoke. Correct me. Yes. You can't do it. I don't mind. So this case can be distinguished, Turner, from what happened in this case. In the Turner case, we had a respiratory therapist who complained that that particular hospital, which was a private hospital, wasn't meeting the Joint Commission standards. In this case, which is just totally different, we have a public entity, and the public policy that's being mandated, once again, is the competency of physicians under the Medical Malpractice Act. I'd also like to correct a reading of the record that suggests that the Cook County Department of Public Health really tried to work with Dr. Lucas. A close reading of the record will reflect that they did not. They told her, you take this training, and in the first letter it said you will be disciplined, and after she reported it, it's very clear she got a letter from her supervisor that said, you take this training or else you're out the door. That's retaliatory. Well, actually, you just said in your opening part that she could have been misled. Not in a brief, but that she should have been told. And when she was told she'd be disciplined, it didn't say termination. It said disciplined, so maybe she thought she'd just be suspended. Don't they have to be just as direct as they were and say, we will fire you if you don't take this training? What's unfair about that? In Cook County, the policy is one of progressive discipline. There was no progressive discipline here. Absolutely none. If there are no further questions, the appellant will conclude. Thank you very much for your close attention to this matter. Thank you. We will take this matter under advice.